RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

IN RE: OMNICARE, INC. SECURITIES LITIGATION.

PAUL ANSFIELD et al.

       *Plaintiffs,*

KBC ASSET MANAGEMENT N.V.,

       *Plaintiff-Appellant,*

  *v.*

OMNICARE, INC.; JOEL GEMUNDER; DAVID W. FROESEL, JR.; JOHN L. WORKMAN; CHERYL D. HODGES,

       *Defendants-Appellees.*

No. 13-5597

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:11-cv-00173—David L. Bunning, District Judge.

Argued: January 30, 2014

Decided and Filed: October 10, 2014

Before: BOGGS and MOORE, Circuit Judges; BARRETT, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Andrew M. McNeela, KIRBY MCINERNEY LLP, New York, New York, for Appellant. Richard W. Reinthaler, WINSTON & STRAWN LLP, New York, New York, for Appellees. **ON BRIEF:** Andrew M. McNeela, Ira M. Press, J. Brandon Walker, KIRBY MCINERNEY LLP, New York, New York, Gary J. Sergent, O'HARA, RUBERG, TAYLOR,

_____

[*]The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

SLOAN & SERGENT, Crestview Hills, Kentucky for Appellant.  Richard W. Reinthaler, John E. Schreiber, WINSTON & STRAWN LLP, New York, New York, William T. Robinson III, Michael E. Nitardy, FROST BROWN TODD LLC, Florence, Kentucky, Mark Alan Vander Laan, Amanda P. Lenhart, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellees.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  On May 11, 2012, KBC Asset Management N.V. ("KBC") filed a Consolidated Amended Complaint ("Complaint"), on behalf of Paul Ansfield and other similarly situated shareholders, against Omnicare, Inc. ("Omnicare") and several of its current and former officers (collectively, "the Individual Defendants"):  Joel Gemunder, former President and Chief Executive Officer; David W. Froesel, Jr., former Chief Financial Officer; John L. Workman, current President and Chief Financial Officer; and Cheryl D. Hodges, former Senior Vice President and Secretary.  In the Complaint, KBC alleged that the defendants had committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.  Specifically, KBC charged the defendants with making various material misrepresentations and omissions between January 10, 2007 and August 5, 2010 ("the Class Period") in public and in SEC filings regarding Omnicare's compliance with Medicare and Medicaid regulations.  Omnicare moved to dismiss the suit for failure to state a valid claim, and the district court granted Omnicare's motion.  KBC now appeals.

The elephant-sized boulder blocking KBC's suit is the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737, codified at 15 U.S.C. § 78u-4, which created heightened pleading standards for securities-fraud cases.  To satisfy this heavier, statutorily created burden, plaintiffs must identify each misleading or false statement and explain how it is misleading.  15 U.S.C. § 78u-4(b)(1)(B).  In addition, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  § 78u-4(b)(2)(A).  These requirements are not easily satisfied.  In this case, we must answer whether plaintiffs have cleared these hurdles and what allegations can be

considered in making that determination.  Our ultimate answers do not favor KBC, and thus, we **AFFIRM** the dismissal of the Complaint.

## I.  BACKGROUND

The actors and allegations in the Complaint are many and muddled.  By way of clarification:  KBC is an asset-management company, located in Brussels, Belgium, that bought and held Omnicare stock during the Class Period.  Its opponent, Omnicare, is the nation's largest provider of pharmaceutical care for the elderly, operating in forty-seven states, the District of Columbia, and Canada.

Gemunder was the President, the CEO, and a director of Omnicare from May 20, 1981 to August 2, 2010.  He allegedly had responsibility for overseeing the company and making various certifications to the SEC.  R. 94 at 7–9 (Compl. at ¶ 11) (Page ID #831–33).  Moreover, KBC claimed that Gemunder had knowledge that Omnicare was not compliant with federal healthcare regulations and misled investors to believe otherwise.  *Id.*

Froesel was a Senior Vice President and the CFO of Omnicare from March 1996 to November 2009.  *Id.* at 9 ¶ 12 (Page ID #833).  KBC alleged that he assisted in preparing various SEC filings and approving their content, which materially misrepresented Omnicare's compliance with federal regulations.  *Id.* at 9–10 ¶ 12 (Page ID #833–34).

Workman joined Omnicare in November 2009 as CFO and has been the President of the company since February 2011.  *Id.* at 10 ¶ 13 (Page ID #834).  Similarly to Froesel, Workman allegedly helped prepare and approved SEC filings, which KBC alleged contained material false and misleading statements regarding Omnicare's compliance with federal healthcare regulations. *Id.*

Hodges was a Senior Vice President and the Secretary of the company from 1994 until August 2, 2010.  *Id.* at 10 ¶ 14 (Page ID #834).  Beforehand, Hodges served as a director of Omnicare.  *Id.*  KBC also alleged that she assisted in the preparation and certification of SEC filings containing false information.  *Id.* at 10–11 ¶ 14 (Page ID #834–35).

**A. Allegations**

Until December 2008, John Stone served as Omnicare's Vice President of Internal Audit, a position that required him to monitor and report on the company's compliance with Medicare and Medicaid regulations. As part of this job, Stone conducted an audit of Omnicare's "previously submitted Medicare and Medicaid claims for 'ancillary services'" from 2000 to 2005, including the provision of durable medical equipment ("DME"). *Id.* at 18–19 ¶¶ 38–42 (Page ID #842–43). Completed in 2007, this audit was known internally as "the Wave I Audit." *Id.* at 19 ¶ 42 (Page ID #843). It examined eighteen of Omnicare's pharmacy facilities that provided ancillary services, and it looked into thirty-nine claims at each facility. *Id.* According to the Complaint, the Wave I Audit revealed "pervasive fraud" at each of the facilities. *Id.* Specifically, the Wave I Audit revealed that each of the Omnicare facilities submitted false reimbursement claims to DME Regional Carriers and several states. *Id.* at 19–20 ¶ 43 (Page ID #843–44). KBC alleged that Stone shared the results of this audit with Omnicare's Internal Audit and Corporate Compliance Committees. *Id.* at 21 ¶ 46 (Page ID #845). Additionally, the Complaint stated that "[o]n information and belief, the information was immediately given to defendants Gemunder, Froesel, and Hodges, and received by defendant Workman when he started at [Omnicare] in November 2009." *Id.*

In 2008, Omnicare's Executive Vice President and Chief Operating Officer, Pat Keefe, commissioned a second audit—known as "the Wave II Audit"—to show that the irregularities found in the Wave I Audit were limited or non-existent. *Id.* at 21 ¶ 49 (Page ID #845). Again, Stone conducted the audit using a limited sample: he examined thirty claims submitted in 2008 from each of fifteen pharmacies. *Id.* at 21–22 ¶ 49 (Page ID #845–46). The Wave II Audit revealed that the examined facilities also had submitted numerous claims without the proper documentation and that an Omnicare subsidiary had billed some Medicaid patients at a higher rate than non-Medicaid patients. *Id.* at 22 ¶¶ 49–50 (Page ID #846). Again, KBC averred that "[o]n information and belief, Stone presented the results of the Wave II [A]udit to Omnicare's Internal Audit and Corporate Compliance Committees and the results were immediately given to defendants Gemunder, Froesel, and Hodges and received by defendant Workman when he started at [Omnicare] in November 2009." *Id.* at 22 ¶ 51 (Page ID #846). In response to these

audits, Stone claimed that Omnicare tried to conceal its fraud by repaying the DME Regional Carriers for the false claims, leaving the state Medicaid claims unaddressed. *Id.* at 23 ¶ 52 (Page ID #847).

After conducting the Wave I and Wave II Audits, Omnicare charged Stone with conducting yet another audit, this time of the company's newly acquired pharmacies. *Id.* at 24 ¶ 55 (Page ID #848). Known as the "Pharmacy Audit," this investigation sought to determine whether the pharmacies complied with Medicare and Medicaid requirements. *Id.* Stone found that they did not totally comply because of "order processing errors and control test failures." *Id.* The Complaint claims that "[a]ccording to Stone, Omnicare was 'fully aware of the []] deficiencies and that their wholly owned, operated and controlled pharmacies were submitting false and fraudulent Medicare and Medicaid claims.'" *Id.* at 24 ¶ 56 (Page ID #848) (second alteration in original). In particular, KBC averred that "Stone shared with Gemunder the results of the [Pharmacy] Audit . . . ." *Id.* at 87 ¶ 193 (Page ID #911). The Complaint also states that "[o]n information and belief" these results were given to all of the Individual Defendants. *Id.* at 25 ¶ 61 (Page ID #849).

Following Stone's presentation of the Pharmacy Audit's results to the Internal Audit Committee, Stone claimed that "'[a]s a direct and proximate cause of [his] presentation to [Omnicare's] Internal Audit Committee, [defendant Gemunder] effectively discharged [Stone] by telling him to begin looking for other employment on or about December 1, 2008.'" *Id.* at 25 ¶ 62 (Page ID #849) (final three alterations in original) (internal quotation marks omitted). Thus, partially as a result of this adverse action, Stone filed a twenty-four-count *qui tam* action against Omnicare under the False Claims Act, alleging that the company committed various kinds of fraud and improperly terminated his employment. *See United States ex rel. Stone v. Omnicare, Inc.*, No. 09-C-4319, 2011 WL 2669659, at *1 (N.D. Ill. July 7, 2011). As evidence, Stone recounted the above-mentioned audits and actions by Omnicare. On August 5, 2010, after the United States declined to intervene, the existence of the Stone *qui tam* action and the audits became public. R. 94 at 24 (Compl. at ¶ 58) (Page ID #848). Twice, the district court dismissed Stone's action without prejudice for failure to state a valid claim, and then on November 20, 2012, that court finally dismissed the fraud allegations in the action with prejudice, finding that

Stone had not pleaded actionable fraud under the False Claims Act. *See United States ex rel. Stone v. Omnicare, Inc.*, No. 09-C-4319, 2012 WL 5877544, at *1 (N.D. Ill. Nov. 20, 2012).

In the Complaint now before us, KBC also put forth several allegations made by confidential witnesses that KBC claims corroborate Stone's allegations. For instance, one confidential witness—a Customer Service Manager at an Omnicare subsidiary—averred that the subsidiary's "Medicare reimbursement requests commonly lacked the records necessary for compliance with federal and state law." R. 94 at 26 (Compl. at ¶ 65) (Page ID #850). When the confidential witness reported his findings to the general manager of the pharmacy, he was allegedly told: "'It's none of [your] f___ing business!'" *Id.* at 27 ¶ 66 (Page ID #851). A second confidential witness, who worked as a billing manager, confirmed this subsidiary's problems with, and the knowledge of Omnicare's supervisors of, non-compliance.

Most importantly, KBC put in the Complaint the allegations of William Fitzpatrick—Omnicare's former Chief Compliance Officer. *See id.* at 31 ¶ 82 (Page ID #855); *see also* Appellant Br. at 9 (identifying "CW5" in the Complaint as Fitzpatrick). Fitzpatrick confirmed the reports of the confidential witnesses and Stone that the Individual Defendants knew of Omnicare's failures to comply with pertinent regulations. R. 94 at 31 (Compl. at ¶ 82) (Page ID #855). The Complaint reads: "Specifically, [Fitzpatrick] advised [KBC] counsel that 'as you were told by other people, I did my best to bring it to the head [i.e. Gemunder], but it didn't work.' [Fitzpatrick] also stated that [he] 'did what [he] was supposed to do as a Chief Compliance Officer and a Corporate Officer and [he] threw up [his] arms, and said I'm retired and I'm going home.'" *Id.* (third alteration in original).

At bottom, KBC claimed that Omnicare and the Individual Defendants knew of these allegations of fraud or non-compliance and that, rather than confessing to the company's failures to comply with the regulations, Omnicare and its officers routinely made material misrepresentations about "(1) its compliance with applicable laws, rules, and regulations; (2) its financial results; (3) the accuracy of the statements contained in its Class Period Forms 10-K and 10-Q; and (4) the root causes of its financial performance." *Id.* at 33 ¶ 86 (Page ID #857). KBC averred that these misstatements started on January 10, 2007 when Gemunder stood before the JP Morgan Healthcare Conference and stated that Omnicare's "goal is to comply with all laws

and regulations" and that he was "'pleased to report that [Omnicare is] getting these matters [prior regulatory violations] behind us.'" *Id.* at 34 ¶ 88 (Page ID #858) (emphasis deleted). Gemunder made these statements, according to KBC, knowing that they were false, given Omnicare's previously acknowledged non-compliance.

KBC further claimed that Omnicare's Form 10-Ks from 2007 to 2010 contained material misrepresentations because they stated that "[Omnicare] believe[s] that [its] billing practices materially comply with applicable state and federal requirements" and that "[Omnicare] believe[s] that [it is] in compliance in all material respects with federal, state and local laws." *Id.* at 35 ¶ 91 (Page ID #859) (emphasis deleted). The Complaint also stated that Gemunder, Froesel, and Workman signed these misleading forms. *Id.* at 35–37 ¶¶ 91–94 (Page ID #859–61). In the alternative, KBC claimed that Omnicare failed in its duty to disclose the audit results once it knew of them, creating an actionable omission.

In the Complaint, KBC also pleaded facts related to scienter, as it must. KBC alleged that each of the Individual Defendants knew that their statements and those of the company, which they personally prepared, were false and misleading. *Id.* at 84 ¶ 184 (Page ID #908). KBC further stated that the Individual Defendants were privy to confidential information that they had a duty to disclose, and by choosing not to do so, they acted with the requisite intent to defraud. *Id.* at 84 ¶ 185 (Page ID #908). The personal acquisition of wealth drove the Individual Defendants to commit fraud, according to KBC, and the defendants purportedly amassed wealth by permitting fraudulent Medicare and Medicaid reimbursements—which allegedly accounted for more than half of Omnicare's business during the Class Period. *Id.* at 86 ¶ 191 (Page ID #910).

**B. Procedural History**

On July 16, 2012, Omnicare and the Individual Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), claiming that KBC had failed to meet the heightened pleading standard under Rule 9(b) and the PSLRA. R. 106 (Mot. to Dismiss at 1) (Page ID #1018). The defendants made three main arguments: KBC failed (1) to identify an actionable misstatement or omission; (2) to plead loss causation adequately; and (3) to allege facts leading to a strong inference of scienter. R. 106-1 at 23–49 (Mot. to Dismiss Mem. at 14–

40) (Page ID #1042–68).  At oral argument on this motion, Omnicare focused heavily on the argument that the Complaint needed to allege that the Individual Defendants had actual knowledge that their statements regarding compliance were false in order to plead adequately an actionable misrepresentation under the PSLRA.  *See* R. 135 (Feb. 14, 2013 Tr. at 20:15–22) (Page ID #1617).  KBC struggled to respond to this argument and quickly turned to an as-yet-unmentioned line of argument:  because Stone, himself, was a senior executive, his knowledge and that of other non-defendant executives could be imputed to Omnicare.  *Id.* at 47:14–23 (Page ID #1644).

The district court rejected KBC's arguments and granted the defendants' motion to dismiss for failure to state a claim.  In its opinion, the district court found that *Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare I*"), 583 F.3d 935 (6th Cir. 2009), governed this case.  *See In re Omnicare, Inc. Sec. Litig.*, 2013 WL 1248243, at *7 (W.D. Ky. Mar. 27, 2013).  Omnicare's compliance-related statements were "'soft' information," and therefore, KBC needed to plead facts demonstrating that defendants had actual knowledge that their statements were false for a district court to find a material misrepresentation.  *Id.*  The district court found that KBC failed to allege such facts; in particular, it never connected one of the Individual Defendants to any specific knowledge of fraudulent claims.  *Id.* at *8–*10.  Moreover, the district court found that KBC's use of "'[o]n information and belief'" was insufficient under the plain language of the PSLRA.  *Id.* at *10 (quoting R. 94 at 21, 22 (Compl. at ¶¶ 46, 51) (Page ID #845–46)) (emphasis deleted).  Additionally, the district court disagreed with KBC's imputation argument because the cases cited by KBC concerned proof of scienter, not actual knowledge for showing a material misrepresentation of soft information.  *Id.* at *11.  The district court stated that the standards are different.  Moreover, even if the knowledge of non-defendant senior executives were imputed to Omnicare, the district court decided that the relevant statements were not misrepresentations because they were phrased in qualified terms or stated as opinions.  *Id.* at *12–*13.  Given these findings, the district court granted the defendants' motion to dismiss under Rule 12(b)(6) and simultaneously rejected KBC's informal request to amend the Complaint.  *Id.* at *17–*18; *see also* R. 137 at 5 (KBC Post-Hr'g Mem. at 4) (Page ID #1729) ("In the event that the Court concludes that Plaintiff's reliance, in part, on the knowledge of non-defendant Omnicare

executives and agents was not adequately pleaded, Plaintiff respectfully requests leave to replead in light of the knowledge by senior personnel that was pleaded, and the case law discussed above."). KBC now appeals the overall dismissal of its suit, though not the district court's decision to deny KBC leave to amend the complaint.

While this appeal has been pending, KBC filed a motion for judicial notice, seeking to have copies of Omnicare's 2004 Charter of the Audit Committee of the Board of Directors, the Corporate Integrity Agreement of 2009, Stone's Response in Opposition to Omnicare's Motion to Dismiss Relator's Complaint ("Stone Opposition"), and Stone's Declaration filed in his *qui tam* action recognized by this court. Appellant Mot. for Judicial Notice ("Appellant MJN") at 2–3. Omnicare opposes the motion.

In addition, Omnicare filed its own motion for judicial notice, asking us to admit into the appellate record copies of Omnicare's 2007, 2008, and 2009 versions of its Form 10-K, its Form 10-Q filed on August 5, 2010, and the original complaint in the Stone *qui tam* action. *See* Appellee Mot. for Judicial Notice ("Appellee MJN") at 1–2. The motion is not opposed.

## II.  MOTIONS FOR JUDICIAL NOTICE

Before evaluating whether KBC pleaded sufficient facts to survive Omnicare's motion to dismiss under Rule 12(b)(6), we first rule upon the parties' motions for judicial notice. According to the Federal Rules of Evidence, a "court may judicially notice a[n] [adjudicative] fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "This standard applies to appellate courts taking judicial notice of facts supported by documents not included in the record on appeal." *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012). However, "[j]udicial notice is only appropriate if 'the matter [is] beyond reasonable controversy. . . . The rule proceeds upon the theory that . . . dispensing with traditional methods of proof [should only occur] in clear cases." *Id.* (quoting Fed. R. Evid. 201(b) advisory committee's note) (final two alterations and ellipses in original). After all, judicial notice is not an alternative avenue for amending the complaint after a district court dismisses the suit for failure to state a claim.

**A.  KBC's Motion for Judicial Notice**

In its motion, KBC asks us to take notice of four documents:  Omnicare's Audit Committee Charter, filed with the SEC in 2004; a version of Omnicare's Corporate Integrity Agreement; the Stone Opposition; and the Stone Declaration.  KBC offers several different arguments in support of its motion, but each of them is flawed.  Therefore, we deny KBC's motion and take judicial notice of none of the documents.

First, KBC asks us to take judicial notice of Omnicare's Audit Committee Charter, which was attached to the company's proxy statement filed with the SEC in 2004.  KBC claims that "this [c]ourt may consider 'not only those documents referenced in the plaintiffs' complaint, but also documents filed with the SEC.'"  Appellant MJN at 5 (quoting *Helwig v. Vencor*, 210 F.3d 612, 618 n.10 (6th Cir. 2000), *rev'd on other grounds*, 251 F.3d 540 (6th Cir. 2001) (en banc), *cert. denied*, 536 U.S. 935 (2002)); *see also id.* at 5 n.2 (citing, *inter alia*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  Because the Committee Charter was filed with the SEC—and thus is a public record—KBC argues that "Defendants cannot challenge the authenticity or admissibility of the [document]."  *Id.* at 6.  KBC, however, misunderstands the permissible scope of judicial notice, and therefore, its argument founders for several reasons.

One, KBC misreads the panel decision in *Helwig* and the Second Circuit's decision in *Kramer*.  Generally, at the motion-to-dismiss stage, a federal court may consider only the plaintiff's complaint.  *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88–89 (6th Cir. 1997).  However, we have recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment.  *Id.* at 89.  Fairness and efficiency require this practice.  As the Second Circuit explained in *Kramer*, "[w]ere courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.  Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements."  937 F.2d at 774.  The question presented in *Kramer* and to the panel in *Helwig* was whether the SEC filings were appropriate

"public records" to be considered at the motion-to-dismiss stage. In that context, this court and the Second Circuit decided that the *defendants* could present SEC filings to rebut the complaint's misleading statements. *See Helwig*, 210 F.3d at 618 n.10; *Kramer*, 937 F.2d at 774. Importantly, neither decision stated that a plaintiff could supplement the complaint on appeal with SEC filings. Accordingly, neither the initial panel decision in *Helwig* nor the Second Circuit decision in *Kramer* provides support for KBC's application for judicial notice of the Committee Charter.

Two, KBC cannot use its application for judicial notice as a vehicle to circumvent the Federal Rules of Civil Procedure. As plaintiff, KBC is the master of its complaint, which means that it can choose the forum in which to file and the law under which it wishes to seek relief. *See, e.g.*, *Curry v. U.S. Bulk Trans., Inc.*, 462 F.3d 536, 543 (6th Cir. 2006). In addition to these privileges, however, KBC also has the duty to put the defendants (and the court) on notice of the claims and charges against the defendants. Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *Conley v. Gibson*, 355 U.S. 41, 47–48 (1957). Moreover, to maintain its suit, KBC must put forth "either direct or inferential allegations [in the complaint] with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner*, 108 F.3d at 88 (citing *Allard v. Weitzman* (*In re DeLorean Motor Co. Sec. Litig.*), 991 F.2d 1236, 1240 (6th Cir. 1993)). Whether KBC *could* allege some facts to support a claim is not important; what is paramount at the motion-to-dismiss stage is whether KBC *did* allege sufficient facts in the Complaint. *See Guzman v. United States Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012). If KBC failed to carry that burden, it could have asked the district court for permission to amend its complaint pursuant to Federal Rule of Civil Procedure 15; it would then be within the district court's discretion whether to allow amendment outside of twenty-one days. *See Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745–46 (6th Cir. 1992). KBC does not challenge the district court's denial of KBC's awkward request to amend the Complaint, and thus, that issue is forfeited. *See Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 434 n.6 (6th Cir. 2014). KBC cannot circumvent this process by asking us to amend the Complaint, effectively, through the vehicle of judicial notice.

Three, taking judicial notice of the existence of Omnicare's SEC filings would not save KBC's Complaint from the impact of Rule 12(b)(6).  Importantly, Federal Rule of Evidence 201 allows a court to take notice of facts not subject to reasonable dispute.  Under this standard, we could take notice only of the fact that Omnicare filed the Audit Committee Charter and what that filing said, but we could not consider the statements contained in the document for the truth of the matter asserted, even at the motion-to-dismiss stage.  *See, e.g.*, *Davis v. City of Clarksville*, 492 F. App'x 572, 578 (6th Cir. 2012) (recognizing this distinction); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 476–77 (6th Cir. 2008) (same).  The existence of the Audit Committee Charter does not relate to the deficiencies in KBC's complaint identified by the district court and at issue here.  Therefore, there is no reason to take judicial notice of the existence of the document.

Second, KBC urges this court to take notice of a version of Omnicare's Corporate Integrity Agreement, which KBC claims was "incorporated by reference in the Complaint." Appellant MJN at 6 (referencing R. 94 at 28 (Compl. at ¶ 72) (Page ID #852)).  In support, KBC cites *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (6th Cir. 2011), and *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011), for the proposition that documents incorporated by reference must be considered part of the complaint.  Appellant MJN at 6.  This proposition finds further support in Federal Rule of Civil Procedure 10(c):  "Adoption by Reference; Exhibits.  A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."  However, KBC has failed to incorporate this document properly, failing in particular to place Omnicare or the court on notice of its contents.  KBC mentions the Corporate Integrity Agreement in only one sentence of the Complaint: "C[onfidential] W[itness] 3 reported that problems surrounding Omnicare's compliance with federal and state laws governing this activity resulted in a five-year Corporate Integrity Agreement . . . with the Office of the Inspector General . . . ."  R. 94 at 28 (Compl. at ¶ 72) (Page ID #852).  This statement noting the document's existence says nothing about its contents and cannot fairly be read to refer Omnicare and the court to the contents of the agreement. Accordingly, it is outside the Complaint.  Moreover, this document helps KBC only if we can consider the contents of the agreement for the truth of the matter.  We cannot, as explained above.  Thus, there is no reason to take notice of its existence now.

Third, KBC requests that this court take notice of the Stone Opposition and the Stone Declaration because they are records from a related court proceeding. Appellant MJN at 6. Appellate courts can take notice of the actions of other courts, *see, e.g.*, *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2012); *Ferguson*, 681 F.3d at 834, but generally, a court will recognize only indisputable court actions, such as the entry of a guilty plea or the dismissal of a civil action, *see e.g.*, *Ferguson*, 681 F.3d at 834. Importantly, "a court cannot notice pleadings or testimony as true simply because these statements are filed with the court." 21B Charles Alan Wright et al., *Federal Practice and Procedure* § 5106.4 (2d ed. 2005). As a result, we could take notice only of the fact that Stone filed his opposition and declaration, but the subject matter of those filings is the heart of the matter contested in this suit. Therefore, this court cannot take notice of those filings for the truth of the matter asserted. And again, the existence of the documents does not address the deficiencies in KBC's complaint. Therefore, there is little to be gained by taking judicial notice of either of these filings.

Fourth, KBC asks that this court take notice of the Stone Declaration because it was incorporated by reference in a supplemental district-court filing. Appellant MJN at 7 n.4 (referencing R. 137 at 2 (KBC's Post-Hr'g Mem. at 1) (Page ID #1726)). As noted above, KBC needed either to incorporate the Stone Declaration into the Complaint by reference or amend the Complaint so it contained the information in the document. KBC did not do so, and it cannot now use judicial notice as a vehicle to wipe out its failure to follow proper procedure.

For these reasons, we deny in total KBC's motion for judicial notice and confine our inquiry to the facts alleged in the Complaint.

## B.  Omnicare's Motion for Judicial Notice

In its motion for judicial notice, Omnicare asks us to admit five documents into the record on appeal:  (1) a copy of Omnicare's 2007 Form 10-K; (2) a copy of Omnicare's 2008 Form 10-K; (3) a copy of Omnicare's 2009 Form 10-K; (4) a copy of Omnicare's Form 10-Q filed with the SEC on August 5, 2010; and (5) a copy of the original complaint in the Stone *qui tam* action and the attached exhibits. *See* Appellee MJN at 1–2. Omnicare notes that the Complaint references or quotes excerpts from these documents and asks us to consider those quotations in their full context. *Id.* at 2–3. Importantly, it does not request that we consider the

documents for the truth of their content. By proceeding in this fashion, Omnicare follows the well-worn path marked by cases such as *Sigler*, 532 F.3d at 476–77, and *Ashland*, 648 F.3d at 467. Therefore, we grant Omnicare's motion and will consider the quotations in the Complaint in the context of the full documents from which they were taken.

## III. STANDARD OF REVIEW

We turn now to the heart of this appeal: whether the district court erred in dismissing KBC's complaint. We review de novo a district court's decision to grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir. 2011). On review, we accept plaintiff's allegations as true and construe the complaint in its favor, *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006), but the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Watson Carpet*, 648 F.3d at 457 (internal quotation marks omitted; alteration in original). "Further, we may affirm the district court's dismissal of [p]laintiffs' claims on any grounds, including those not relied on by the district court." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (citing *Hoffman v. Comshare, Inc.* (*In re Comshare, Inc. Sec. Litig.*), 183 F.3d 542, 548–49 (6th Cir. 1999)).

## IV. LEGAL STANDARDS

For us to reverse the district court, KBC must show that it pleaded "enough facts [as to each element of the cause of action] to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. There are six elements to a securities-fraud suit under § 10(b) of the 1934 Act and SEC Rule 10b-5[1]: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

---

[1]The United States Supreme Court has recognized that "[t]he scope of Rule 10b-5 is coextensive with the coverage of § 10(b) . . . ." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)). As a result, like the Supreme Court, "we [will] use § 10(b) to refer to both the statutory provision and the Rule." *Id.*

causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (internal quotation marks omitted). On appeal, the parties dispute two elements that are relevant for this decision—Element One (a material misrepresentation or omission) and Element Two (scienter). Our court has covered the standards for pleading these elements many times, and yet for all of our efforts and many pronouncements, the precise requirements for sufficiently pleading them, at least in this circuit, remain somewhat hazy and muddled. Therefore, before analyzing KBC's actual allegations, we will attempt to state the doctrine simply and in a straightforward manner in the hope of clearing away any confusion.

## A. Element One: Material Misrepresentation or Omission

Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact. *See, e.g.*, *Matrixx*, 131 S. Ct. at 1318. General allegations of these two components, however, are not enough. Under Federal Rule of Civil Procedure 9(b) and the PSLRA, a plaintiff's complaint must also "allege the time, place, and content of the alleged misrepresentation [or omission] on which he or she relied [and] the fraudulent scheme . . . ." *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare II*"), 719 F.3d 498, 503 (6th Cir. 2013) (internal quotation marks omitted), *cert. granted*, 2014 WL 801097 (Mar. 3, 2014) (No. 13-435). Unfortunately for all involved, reciting these talismanic standards actually does little to clarify the doctrine because we have created and conflated different tests and concepts in our prior decisions for evaluating this element. Specifically, we have failed to recognize that we must apply a different analytical framework to cases based on affirmative misrepresentations, as opposed to omissions, and that different rules apply when the misrepresentation or omission concerns hard, as opposed to soft, information.

### 1. Actionable Misrepresentation

A misrepresentation is an affirmative statement that is misleading or false. When an alleged misrepresentation concerns "hard information"—"typically historical information or other factual information that is objectively verifiable"—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or

misleading. *Murphy v. Sofamor Danek Grp., Inc.* (*In re Sofamor Danek Grp., Inc.*), 123 F.3d 394, 401 (6th Cir. 1997) (internal quotation marks omitted); *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–70 (6th Cir. 2005). When an alleged misrepresentation concerns "soft information," which "includes predictions and matters of opinion," *id.*, a plaintiff must additionally plead facts showing that the statement was "made with knowledge of its falsity," *Omnicare I*, 583 F.3d at 945–46.

It is this latter type of alleged misrepresentation that is at issue here and that has given us and other courts such trouble because it adds a subjective inquiry to an otherwise objective element, thus conflating two elements of the six-element cause of action—an actionable misrepresentation and scienter. *See, e.g.*, *Brown v. Credit Suisse First Bos. LLC* (*In re Credit Suisse First Bos. Corp. Sec. Litig.*), 431 F.3d 36, 48 (1st Cir. 2005) (recognizing that "the subjective aspect of the falsity requirement and the scienter requirement essentially merge"), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) (recognizing same). Until now, we have ignored this merger of elements and analyzed whether a defendant had actual knowledge under both Elements One and Two. *See, e.g.*, *Omnicare I*, 583 F.3d at 945–47 (analyzing knowledge of falsity under the material-misrepresentation requirement); *Zaluski*, 527 F.3d at 573 (same); *City of Monroe*, 399 F.3d at 670–76, 684–88 (analyzing knowledge of falsity under both requirements). In doing so, we have muddled the analytical framework, making it more difficult for lower courts and parties to evaluate whether a plaintiff has sufficiently pleaded a cause of action.

In the end, we must choose one way or the other to analyze a defendant's actual knowledge. Whether courts choose to evaluate this subjective component as part of their material-misrepresentation analysis or their scienter analysis makes little difference for the parties. Under either approach, Plaintiffs will need to allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time that they were made. But for the sake of clarity, it makes the most sense to adopt the First Circuit's approach and conceive of this additional requirement as raising the bar for alleging scienter. *See In re Credit Suisse*, 431 F.3d at 48–49; *see also* Wendy Gerwick

Couture, *Opinions Actionable as Securities Fraud*, 73 La. L. Rev. 381, 394–401 (2013). Doing so would allow courts to evaluate materiality and whether the statement was misleading or false—two objective inquiries—under the material-misrepresentation prong and then to save all subjective inquiries for the scienter analysis. In addition, whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind—the general subject of a scienter inquiry.

### 2. Actionable Omission

In lieu of targeting a defendant's misleading or false statements, a plaintiff may focus on a defendant's omission—its failure to disclose information when it had a duty to do so. "A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' or, as relevant in this case, 'an inaccurate, incomplete[,] or misleading prior disclosure.'" *City of Monroe*, 399 F.3d at 669 (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3d Cir. 2004)). To complicate matters further, when a person or corporation comes into possession of information that makes a prior statement "inaccurate, incomplete, or misleading," different duties to disclose the new information arise, perhaps unsurprisingly, depending on whether the new information is hard or soft. If the new information is hard, then a person or corporation has a duty to disclose it if it renders a prior disclosure objectively inaccurate, incomplete, or misleading. *See Zaluski*, 527 F.3d at 576 (citing *City of Monroe*, 399 F.3d at 673). If the new information is soft, then a person or corporation has a duty to disclose it "'only if [it is] virtually as certain as hard facts'" and contradicts the prior statement. *Sofamor Danek*, 123 F.3d at 402 (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)). In other words, the new information must be so concrete that the defendant must have actually known that the new information renders the prior statement misleading or false and still did not disclose it. Whether newly acquired soft information is sufficiently concrete to trigger a duty to disclose will undoubtedly depend upon the facts in a given case, and the nature of both the prior disclosure and the new information will determine whether new information makes a prior disclose false or misleading.

**3. Materiality**

Regardless of whether a plaintiff chooses to proceed under a misrepresentation theory or one based on an omission, he will have to allege facts that satisfy § 10(b)'s materiality component. Unfortunately, the analytic approach for evaluating "materiality" is not much clearer than the first part of this element.

The purpose of "the materiality requirement is not to 'attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of [opinion statements],' but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic, Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir. 1987)). To this end, we have said before that "[m]isrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Sofamor Danek*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Basic, Inc.*, 485 U.S. at 232). Put another way, a "'fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Basic, Inc.*, 485 U.S. at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "'Immaterial statements include vague, soft, puffing statements or obvious hyperbole' upon which a reasonable investor would not rely." *Public Sch. Teachers' Pension & Ret. Fund of Chi. v. Ford Motor Co.* (*In re Ford Motor Co. Sec. Litig.*), 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)).

This standard and these examples, however, are vague and provide little guidance in close cases. At first glance, this doctrine might appear "both clever and intuitively sensible," but it has the potential to "look more like a heuristic rather than an entirely legitimate doctrine" when used too often "at the motion to dismiss stage (where materiality, being a fact question, typically should not be decided) . . . ." Stephen M. Bainbridge & G. Mitu Gulati, *How Do Judges Maximize? (The Same Way Everybody Else Does—Boundedly): Rules of Thumb in Securities Fraud Opinions*, 51 Emory L.J. 83, 115 (2002). In general, the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements.

Thus, we must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context. *See* Jennifer O'Hare*, The Resurrection of the Dodo: The Unfortunate Re-emergence of the Puffery Defense in Private Securities Fraud Actions*, 59 Ohio St. L.J. 1697, 1727–1731 (1998) (illuminating the importance of context to materiality determinations). Otherwise, we risk prematurely dismissing suits on the basis of our intuition.

## B. Element Two: Scienter

To satisfy Element Two, plaintiffs must plead facts showing that defendants had a "'mental state embracing intent to deceive, manipulate or defraud.'" *In re Comshare*, 183 F.3d at 548 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). In the past, we have read this language to require plaintiffs to allege facts showing that defendants acted with at least recklessness. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550 (6th Cir. 2001) (en banc). However, when plaintiffs accuse defendants of misrepresenting or omitting soft information, as KBC does in this case, plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public. *Omnicare II*, 719 F.3d at 505; *Omnicare I*, 583 F.3d at 945–46.

In run-of-the-mill fraud cases, KBC could allege this mental state "generally," Rule 9(b), but in securities-fraud actions, Congress has imposed a higher standard, requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). Interpreting this language, the Supreme Court has created a three-part test for lower courts to apply in assessing the sufficiency of a plaintiff's scienter allegations. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). First, a court must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, a court "must consider the complaint in its entirety" and decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23. Third, assuming that plaintiff's allegations create a "powerful or cogent" inference of scienter, *id.* at 323, a court must compare this inference with other competing possibilities, allowing the complaint to go forward "only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged," *id.* at 324. *See also Frank v. Dana Corp.*, 547 F.3d 564, 570–71 (6th Cir. 2008) (adopting this approach).

When the defendant is an individual, we examine the facts and apply this test in a rather straightforward manner, considering factors such as whether there was:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552. The more of these factors that are present, the stronger the inference that the defendant made his statement with the requisite state of mind.

This analysis can become much more complicated when the defendant is a corporation because there is the additional question of whose knowledge and state of mind matters. For liability to attach to the corporation, must the person misrepresenting a material fact in the name of the corporation have also done so with scienter, or is it enough that some person in the corporate structure had the requisite state of mind? If the latter conception is correct, how high in the hierarchy of the corporation must the person with scienter be, and what must his relationship be to the statement? Our sister circuits have answered these questions differently; scholars disagree; and we have been less than precise in our prior pronouncements. Therefore, we try once more to survey the terrain and explain where we stand on the doctrine of collective corporate scienter.

**1. The Lay of the Land**

In 2004, the Fifth and Eleventh Circuits adopted a narrow view in keeping with common-law-fraud principles, allowing scienter to be imputed to the corporation only under a theory of *respondeat superior*. These circuits "look to the state of mind of the individual corporate official

or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all of the corporation's officers and employees acquired in the course of their employment." *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *see also Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018–19 (11th Cir. 2004) (implicitly adopting this approach). For support, these circuits cite general common-law fraud principles and cases from other circuits noting that "'there is no case law [as of 2004] supporting an independent collective scienter theory.'" *Southland*, 365 F.3d at 366 (quoting *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)).

A year later, a panel of this court took a very different approach, allowing the knowledge of a corporate officer to be imputed to the corporation even though that officer did not issue the false or misleading statement. *See City of Monroe*, 399 F.3d at 688–90. In that case, the plaintiffs alleged that the corporation made several material misrepresentations in its annual report, and we held that these statements were actionable. *Id.* at 680–81. Plaintiffs also alleged that the CEO had actual knowledge that these statements were false or misleading, and we held that this knowledge could be attributed to the corporation, even though the complaint failed to link the CEO to the issuance of the statements. *Id.* at 688–89. As a result, we decided that the plaintiffs' suit could go forward against the corporation, our having concluded that plaintiffs adequately pleaded Element One and Element Two. *Id.* at 689. Importantly, because the plaintiffs did not claim that the CEO issued the misrepresentations, we dismissed the suit against the CEO in his personal capacity. *Id.* at 690. In adopting this more expansive view of collective corporate scienter, we cited a securities-regulation treatise and analogized from a Tenth Circuit case. *See id.* at 688 (citing 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003)).

Several years later, the Second, Seventh, and Ninth Circuits weighed in, though none of these circuits sided fully with either camp in this circuit split. The Seventh Circuit recognized that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor Issues & Rights, Ltd. v. Tellabs*

*Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).   The court reasoned:   "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero.  There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  *Id.*  In this case, however, it was unnecessary to rely upon an expansive view of collective corporate scienter because the court held that the plaintiffs adequately pleaded that the CEO knowingly misrepresented material facts with the intent to defraud and that his individual liability could be imputed to the corporation.  *Id.* at 711.

Somewhat similarly, the Second Circuit agreed that plaintiffs could plead collective corporate scienter, at least in some cases, and overcome the PSLRA's requirements.  The court stated:  "we do not believe that [Congress] imposed the rule . . . that in no case can corporate scienter be pleaded in the absence of successfully pleading scienter as to an expressly named officer."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  That said, the court concluded that the plaintiffs "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were misleading" and, thus, that the plaintiffs failed to state a valid claim.  *Id.* at 197.

Finally, the Ninth Circuit added to this middle position, stating that it "had at that time [2002] not categorically rejected the concept of 'collective scienter'" and that "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication."  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (citing *Makor Issues*, 513 F.3d at 710).  Importantly, the Ninth Circuit pared back *Nordstrom*, which the Fifth Circuit had relied upon, writing that "*Nordstrom* does not foreclose the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate."  *Id.*  The court nevertheless concluded that *Glazer Capital* was not such a case and required the plaintiff "to plead scienter with respect to those individuals who actually made the false statements . . . ."  *Id.* at 745.  Surprisingly, none of the 2008 decisions cited or discussed *City of Monroe*.

## 2. Merits of the Approaches

Since *Southland* and *City of Monroe* were decided, courts and commentators have debated the merits of the two approaches. Most agree that neither—when taken to the extreme—is ideal, though there is no consensus about how to calibrate the middle ground. Slanting too far toward the Fifth Circuit's approach risks running counter to the goals and purposes of the 1934 Act—which include fostering "an attitude of full disclosure by publicly traded corporations, rather than a philosophy of *caveat emptor* for securities buyers." Heather F. Crow, *Riding the Fence on Collective Scienter: Allowing Plaintiffs to Clear the PSLRA Pleading Hurdle*, 71 La. L. Rev. 313, 317 (2010) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). For instance, "in situations where a corporate policy, procedure, or *sub rosa* encouragement of illegal or tortious behavior results in the commission of an offense, but there is no single identifiable culpable actor, [the Fifth Circuit's approach] would not place the requisite culpability on the corporation." Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 113–14 (2006); *see also* Craig L. Griffin, Note, *Corporate Scienter Under the Securities Exchange Act of 1934*, 1989 BYU L. Rev. 1227, 1244 ("A requirement that corporate liability may lie only where all culpable knowledge exists in a single individual would allow a corporation to engage freely in conscious ignorance by keeping lines of communication between different departments closed.").

In contrast, reading our decision in *City of Monroe* too broadly could expose corporations to liability far beyond what Congress has authorized. In that case, we stated that "'knowledge of a corporate officer *or agent* acting within the scope of [his] authority is attributable to the corporation.'" *City of Monroe*, 399 F.3d at 688 (quoting 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002)) (alteration in original; emphasis added). If the scienter of any agent can be imputed to the corporation, then it is possible that a company could be liable for a statement made regarding a product so long as a low-level employee, perhaps in another country, knew something to the contrary. *See* Kevin O'Riordan, Note, *Clear Support or Cause for Suspicion? A Critique of Collective Scienter in Securities Litigation*, 91 Minn. L. Rev. 1596, 1613–14 (2007) (citing cases). Such a result runs contrary to

the PSLRA, which increased the scienter pleading requirements to prevent strike suits. *Id.* at 1614.

### 3. Our Standard

Given that neither approach is ideal, a middle ground is necessary. In addition, our prior decision in *City of Monroe*, if read in an overly broad manner, potentially supports a theory of scienter at odds with the PSLRA. Therefore, going forward, we adopt the following formulation of the rule:

> The state(s) of mind of any of the following are probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b): . . .
>
>     a.    The individual agent who uttered or issued the misrepresentation;
>
>     b.    Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;
>
>     c.    Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance . . . .

Abril & Olazábal, *Locus*, *supra*, at 135 (emphasis deleted).[2] We think that this clarification of the rule not only remains true to our prior statements, but also goes a long way toward solving the flaws of the two approaches discussed above.

First, this rule is consistent with our prior pronouncement in *City of Monroe*, though it qualifies some of that opinion's overly broad language. We recognize that "'[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). Admittedly, some of the language in *City of*

---

[2]Abril and Olazábal append another prong to this test—the corporation itself. *See* Abril & Olazábal, *Locus*, *supra*, at 135. At this point, we see no need to expand our rule to include this highly theoretical portion of their test.

*Monroe* suggests that the knowledge of any agent of the company could be imputed to the corporation, but that case turned on the CEO's knowledge, a person included in Part C of our rule. *See City of Monroe*, 399 F.3d at 688. The broader language of the opinion is not necessary to arrive at that panel's conclusion and is, thus, dicta. *See United States v. Wells*, 473 F.3d 640, 647–48 n.5 (6th Cir. 2007) (rephrasing a prior panel's statement when it used overly broad language to decide a narrower point). Moreover, the result of that case would not change under our clarification of the standard. The CEO's knowledge, after all, would be imputed to the corporation under our formulation of the standard. Therefore, under these conditions, our precedents and procedures justify our formulation of this circuit's collective-scienter standard.

Second, this formulation of the rule largely prevents corporations from evading liability through tacit encouragement and willful ignorance, as they potentially could under a strict *respondeat superior* approach. Under our formulation of the rule, a corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information to their superiors with the intent to defraud the public. As a result, corporations that willfully permit or encourage the shielding of bad news from management will potentially be liable. And therefore, the ultimate purpose of the 1934 Act will be served.

Third, our formulation protects corporations from liability—or strike suits—when one individual unknowingly makes a false statement that another individual, unrelated to the preparation or issuance of the statement, knew to be false or misleading. By allowing courts to examine only the states of mind of lower-level employees connected to the statements, our formulation prevents plaintiffs from abusing the broad dicta in *City of Monroe* and running afoul of the PSLRA.

## V.  APPLICATION

**A. Element One:  Material Misrepresentation**

For KBC to defeat Omnicare's motion to dismiss its securities-fraud action, KBC must first show that its Complaint contained allegations that Omnicare or an Individual Defendant made an actionable material misrepresentation or omission. On appeal, KBC focuses our attention on one set of statements and one omission: (1) Omnicare's 2007–2010 SEC filings in

which Omnicare stated that it believed it was complying with federal, state, and local law**3**; and (2) Omnicare's failure to report its non-compliance with the regulations after receiving the results of Stone's audits, respectively. The district court found that none of these allegations were sufficient to state a valid claim. We address each contention and its relation to the Individual Defendants and Omnicare in turn.

### 1. Affirmative Statements

As noted above, KBC first focuses our attention on statements that Omnicare made in filing its 2007 to 2010 versions of Form 10-K. In those filings, Gemunder, Froesel, and Workman—on behalf of Omnicare—certified:

> Medicare and Medicaid providers and suppliers are subject to inquiries or audits to evaluate their compliance with requirements and standards set forth under these government-sponsored programs. These audits and inquiries, as well as our own internal compliance program, from time-to-time have identified overpayments and other billing errors resulting in repayment or self-reporting to the applicable agency. *We believe that our billing practices materially comply with applicable state and federal requirements.* However, the requirements may be interpreted in the future in a manner inconsistent with our interpretation and application. . . .

> Although *we believe that we are in compliance in all material respects with federal, state and local laws*, failure to comply could subject us to denial of the right to conduct business, fines, criminal penalties and other enforcement actions.

R. 94 at 35–37 (Compl. at ¶¶ 91–94) (Page ID #859–61). KBC alleged in the Complaint that the italicized text above constituted a material misrepresentation. *Id.* at 37 ¶ 95 (Page ID #861). On appeal, KBC admits that these statements concern soft information, which triggers a higher scienter requirement that is addressed below. For this element, however, KBC must show that it alleged facts that, if proven, would support findings that these statements (a) concerned a material fact; and (b) were objectively false or misleading.

---

**3**Defendants argue that KBC is changing its allegations on appeal, moving away from allegations that Omnicare and the Individual Defendants covered up a fraudulent scheme to claims that the defendants professed material compliance while knowing that Omnicare was not following reimbursement regulations. *See* Appellee Br. at 28–29. While KBC has adopted a more restrained tone in its briefing than found in the Complaint, it did plead that "Defendants knew, but failed to disclose, . . . that Omnicare was not complying with Medicare and Medicaid reimbursement regulations" and that "Defendants had no good faith basis to assert that Omnicare's billing practices were in compliance with applicable state and federal regulations or that Omnicare was in compliance in all material respects with applicable federal, state, and local laws and regulations." R. 94 at 37–38 (Compl. at ¶ 95) (Page ID #861–62). The Complaint may not be artfully drafted, but if construed in favor of the non-moving party, KBC, the Complaint contains the seeds of the arguments pushed by KBC on appeal. That is enough.

### a. Materiality

In this case, one might be skeptical of whether a reasonable investor would put much stock in Omnicare's statements regarding legal compliance cited by KBC.  According to the Complaint, Omnicare used the same boilerplate language in each Form 10-K over several years.  *See id.* at 35–37 ¶¶ 91–94 (Page ID #859–61).  Moreover, it is vague language that leaves Omnicare a great amount of wiggle room, and it appeared in only two paragraphs in each document, each of which spanned roughly two hundred pages.  *See, e.g.*, Appellee MJN at Ex. A.  Looking just at these documents, it is difficult to believe that a somewhat-competent investor— let alone one we would trust with our own money—would change her behavior if she knew the precise results of the individual audits.  However, as we have said and the Supreme Court has made clear, context matters when analyzing materiality.  *See, e.g.*, *Matrixx*, 131 S. Ct. at 1321; *City of Monroe*, 399 F.3d at 672.  Here, we must consider—as KBC points out in the Complaint—that Omnicare had a recent history of legal problems surrounding non-compliance. *See* R. 94 at 31–33 (Compl. at ¶¶ 83–85) (Page ID #855–57).  The company paid the government $98 million to settle a prior case.  *Id.* at 31 ¶ 83 (Page ID #855).  And in light of this past history, we conclude that a reasonable jury could find that any information showing compliance problems for Omnicare—arguably in conflict with Omnicare's statements in the Form 10-K submissions—would change an investor's mind about whether to buy or sell stock in Omnicare. Accordingly, we hold that Omnicare's material-compliance statements in the Form 10-Ks concern material facts.

### b. Objective Falsity

We must next determine whether KBC alleged facts demonstrating that Omnicare's compliance-related statements were objectively false or misleading in light of the information now known.  This, too, is a difficult question given the nature of the statements involved, and we must pull the individual statements apart to determine whether a reasonable jury could find them false or misleading.  *See Zaluski*, 527 F.3d at 573; *City of Monroe*, 399 F.3d at 674.

First, Omnicare admitted that it conducts audits and that those audits reveal incidents of non-compliance.  *See, e.g.*, R. 94 at 35 (Compl. at ¶ 91) (Page ID #859).  In its briefing and at oral argument, Omnicare asserted that this disclosure alone means that KBC cannot carry its

burden of alleging facts that would allow a reasonable juror to conclude that Omnicare made a statement that was false or misleading. *See* Appellee Br. at 36–37; *see also Kuyat v. BioMetric Therapeutics, Inc.*, 747 F.3d 435, 443 (6th Cir. 2014) (recognizing that "[o]ther courts have concluded that disclosing adverse information to the public negates an inference of scienter"). The problem is that KBC never alleged that Omnicare needed to disclose that the audits happened; KBC faults Omnicare for claiming that it was in material compliance after learning the results of the audits, and no one contends that Omnicare disclosed the results of the audits. Thus, Omnicare's argument fails.

Second, Omnicare stated that it "believe[d] that [its] billing practices materially compl[ied] with applicable state and federal requirements," but that the government might interpret the regulations differently. R. 94 at 35 (Compl. at ¶ 91) (Page ID #859) (emphasis deleted). By appending "we believe" to the beginning of the sentence and recognizing that the government might have a different view, Omnicare made it extremely difficult for a plaintiff to disprove the literal import of the company's statements. Any reliance, however, on this hypertextualist argument is for naught. In passing the 1934 Act, Congress did not intend to allow corporations or their officers to insulate themselves by simply attaching throat-clearing language to their public utterances. *See Basic, Inc.*, 485 U.S. at 230 (recognizing that the goal of the 1934 Act was to ensure full and fair disclosure of information). Therefore, we examine the substance of Omnicare's statement—that it was in material compliance with federal, state, and local laws. We must answer whether a reasonable jury could find that the results of the Wave I, Wave II, or Pharmacy Audits render Omnicare's material-compliance statement false or misleading. *See Zaluski*, 527 F.3d at 573.

The answer, at this stage of the litigation, is that KBC has pleaded sufficient facts regarding the Wave II Audit and the Pharmacy Audit that, if proven true, could support a finding of objective falsity.[4] According to the Complaint, the Wave II Audit revealed "substantial fraud," R. 94 at 21 (Compl. at ¶ 49) (Page ID #845), and billing irregularities, *id.* at 22 ¶ 50

---

[4]The Wave I Audit results have little relevance to this question because they pertain to Omnicare's compliance with applicable regulations from 2000 to 2005—well before the Class Period. *See* R. 94 at 19 (Compl. at ¶ 42) (Page ID #843).

(Page ID #846). The Pharmacy Audit[5] apparently showed "that Omnicare's pharmacies were in violation of numerous statutory and regulatory requirements" and that those pharmacies "were submitting false and fraudulent Medicare and Medicaid claims." *Id.* at 24 ¶¶ 55, 56 (Page ID #848) (internal quotation marks omitted). In its briefing, Omnicare asserts that the pharmacies and services audited constituted a tiny percentage of Omnicare's overall business assets, and therefore, even if the audits painted an accurate picture, they could not show that Omnicare—as a whole—was not in material compliance with the law. *See* Appellee Br. at 8. This argument, however, is one for the summary-judgment stage and irrelevant at this point in the litigation. We look only to the Complaint and the documents attached to it. *Kottmyer*, 436 F.3d at 688. Considering only these documents and accepting their allegations as true, we conclude that a reasonable jury could find that the results of the Wave II Audit and the Pharmacy Audit make Omnicare's material-compliance statements objectively false or misleading.[6] Thus, we hold that KBC's complaint sufficiently pleaded Element One with regard to these affirmative statements.

## 2. Omissions

We turn next to KBC's alternative theory that the defendants had a duty to disclose the results of Stone's audits and committed an actionable, material omission by failing to do so. KBC basically claims that once Omnicare learned the results of the Stone audits, it had a duty to correct its statement that it was in material compliance with laws and regulations. The district court rejected this argument, finding that Omnicare's compliance statements constituted soft information that did not need to be corrected because only third parties could determine whether Omnicare was in material compliance. *In re Omnicare, Inc.*, 2013 WL 1248243, at *13. For support, the district court cited our decision in *Omnicare I. Id.* We disagree and hold that KBC

---

[5] At oral argument, Omnicare claimed that the Complaint never alleged facts indicating whether the Pharmacy Audit examined these pharmacies' submissions before or after coming under the control of Omnicare. The language in the Complaint is ambiguous; the use of the past tense does not settle when in the past the noncompliance happened. Furthermore, the Complaint states that "[t]he Pharmacy Audit revealed pervasive *ongoing* fraud . . . ." R. 94 at 24 (Compl. at ¶ 57) (Page ID #848). Given that this sentence would indicate that the irregularities continued up to the time that Omnicare's auditors discovered them, it would seem that they happened under Omnicare's watch. As a result, drawing all inferences in favor of the non-moving party, we conclude that the Pharmacy Audit could be discussing the pharmacies' practices under Omnicare.

[6] KBC does not need to recite in the Complaint the specific results of the audits, including the percentage of Omnicare claims audited or the non-compliance rate. Under the PSLRA, it is enough to identify the misrepresentations (the Form 10-K statements) and explain how they are false or misleading (they conflict with the results of the audits, which show billing irregularities). 15 U.S.C. § 78u-4(b)(1)(B).

has sufficiently pleaded Element One under an omission theory as well, meaning that a reasonable jury could find that the audit results were material facts[7] and that Omnicare had a duty to disclose those results.

Our analysis of materiality and duty to disclose largely mirrors our analysis above in Part V.A.1, except for two points. One, we reject the notion that a third party's actions have any bearing on whether Omnicare's statements in the Form 10-Ks needed to be updated and corrected. As noted above, in the Form 10-Ks, Omnicare stated that it "believe[d] that [its] billing practices materially comply with applicable state and federal requirements." R. 94 at 37 (Compl. at ¶ 94) (Page ID #861) (emphasis deleted). This statement neither states nor implies that Omnicare is predicting the actions of a third party. And certainly, a company could have enough internal information to know that it had severe compliance issues. *See City of Monroe*, 399 F.3d at 672. Thus, we have difficulty understanding why the district court focused on whether a government entity would adjudge Omnicare non-compliant. In this case, the actions of the government are irrelevant.

Two, we note that if a reasonable jury could find that Omnicare's Form 10-K statements were objectively false, then the same jury could find that Omnicare had a duty to disclose the results of the audits after issuing its material-compliance statements in those SEC forms. The analysis is largely the same, though the chronology is reversed. In the misrepresentation analysis, a defendant has the information—in this case, the audit results—and then makes an affirmative statement to the contrary. In this instance, the defendant allegedly made a statement, learned that it was false, and chose to remain quiet. At this point in the analysis, though, the jury needs to find only that the information and the statement conflict, and if a reasonable jury could find a statement of soft information objectively false, then the contrary information must be "virtually as certain as hard facts." *Sofamor Danek*, 123 F.3d at 402 (internal quotation marks omitted). It makes little difference which piece came first, and thus, for the reasons stated in Part V.A.1.b, we conclude that KBC has also met its burden for proving Element One under an omission theory.

---

[7]For the reasons explained above, we hold that a reasonable jury could find that the disclosure of the audit results would have caused a reasonable investor to alter his decision to buy or sell Omnicare stock.

**B. Scienter**

To survive Omnicare's motion to dismiss, KBC must also have pleaded particular facts giving rise to a strong inference of scienter, meaning that KBC alleged facts showing that Omnicare or the Individual Defendants filed the Form 10-K statements, knowing they were false, with the intent to defraud the public, or that they knowingly failed to correct them with the same intent. On this point, KBC maintains that the Complaint contains allegations showing that (1) the Individual Defendants knowingly acted to defraud the public, a state of mind that can then be imputed to Omnicare; and (2) Omnicare is liable under a theory of collective scienter. Neither argument succeeds, and therefore we affirm the district court's dismissal of KBC's complaint.

**1. Scienter of Individual Defendants**

We agree with the district court that the Complaint does not sufficiently tie Gemunder (or any of the Individual Defendants) to the Stone audits, and thus, KBC has failed to plead sufficient facts showing that Gemunder or the other Individual Defendants had actual knowledge that the Form 10-K statements were false. Because the statements at issue concerned soft information, this lack of knowledge is fatal to KBC's claims against the Individual Defendants.

The Complaint states that "Stone presented the results of the Wave I [A]udit to Omnicare's Internal Audit and Corporate Compliance Committees," but it never states with particularity who sat on those committees or what the committee members' responsibilities were in the corporate structure.[8] R. 94 at 21 (Compl. at ¶ 46) (Page ID #845). Moreover, as noted above, the Wave I Audit concerned submissions from 2000 to 2005 and sheds little light on whether the Form 10-K statements regarding practices in 2007 and later were made with actual knowledge of their falsity.

Regarding the more-relevant Wave II Audit, the Complaint claims "[o]n information and belief" that the results were given to the Individual Defendants. *Id.* at 19 ¶ 51 (Page ID #846).

---

[8]KBC attempts to remedy this deficiency by asking this court to take judicial notice of the Audit Committee Charter. *See* Appellant MJN at 2. However, for the reasons recited above in Part II, we reject KBC's motion, and as a result, we look only to the Complaint in determining whether KBC alleged sufficient facts that tie Gemunder and the other Individual Defendants to the Stone audits.

However, the PSLRA states that "if an allegation regarding the [fraudulent] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Here, KBC never alleged any specific facts to explain the basis for its belief that the results of the Wave II Audit were communicated to the Individual Defendants beyond the conclusory statement that the results must have been given to them.  Thus, under the PSLRA, KBC has failed to link the Individual Defendants to the Wave II Audit.

KBC gets more mileage out of its allegations concerning Gemunder and the Pharmacy Audit, but it still falls short of showing adequately pleaded scienter.  In the Complaint, KBC claimed that "Stone shared with Gemunder the results of the [Pharmacy] Audit . . . ."  R. 94 at 87 (Compl. at ¶ 193) (Page ID #911).  KBC, however, never alleges specifically what those results were.  At one point, the Complaint reads:  "The Pharmacy Audit revealed pervasive ongoing fraud that had not been disclosed to the investing public . . . ."  *Id.* at 24 ¶ 57 (Page ID #848).  But the Complaint never offers concrete details, other than to say generally that the audit revealed fraud and compliance issues, that would allow us to determine whether Gemunder knew that the Form 10-K statements were false.  Instead, KBC points us to Paragraph 193 of the Complaint, in which KBC alleges that Gemunder told Stone to "'begin looking for other employment'" directly after Stone informed Gemunder of the Pharmacy Audit results.  *Id.* at 87 ¶ 193 (Page ID #911).  KBC reasons that, whatever Stone told Gemunder, it would have been enough to give Gemunder actual knowledge that the Form 10-K statements were false.  *See* Appellant Br. at 27.  Otherwise, KBC posits, there would be no reason for Gemunder to terminate Stone's employment.  *Id.*

Unfortunately for KBC, this speculative reasoning—however persuasive its logic—is not able to overcome the high pleading standards erected by Rule 9(b) and the PSLRA.  As the district court stated, "[KBC] has not alleged with particularity what the specific results of the [P]harmacy [A]udit demonstrated or what was communicated to Gemunder, i.e.[,] how many pharmacies were involved, what specific irregularities were found, how many actual claims were involved, or how, or what, information was actually communicated."  *In re Omnicare, Inc.*, 2013 WL 1248243, at *10.  KBC merely makes general statements and heaps inference upon

inference; the Complaint never alleges that Person A did Act B at Time C, which is required by the PSLRA. Accordingly, we do not agree with KBC that the Complaint alleges sufficient facts showing that Stone directly gave any of the Individual Defendants actual knowledge that the Form 10-K statements were false.

In a last effort to show that the Individual Defendants had actual knowledge of Omnicare's non-compliance, KBC directs us to Paragraph 82, which describes the statements and allegations of Confidential Witness 5—William Fitzpatrick—Omnicare's former Chief Compliance Officer. This attempt fails to pass muster as well. In relevant part, the Complaint states: "[Fitzpatrick] confirmed the reports of the other confidential witnesses detailed above, and *qui tam* relator Stone, stating that [he] had brought *compliance related concerns* to the attention of defendant Gemunder and other Omnicare executives." R. 94 at 31 (Compl. at ¶ 82) (Page ID #855) (emphasis added). These concerns supposedly included the results of Stone's audits and other examples of non-compliance. *Id.* While the district court rightly recognized that this allegation came closest to pleading actual knowledge, the district court ultimately rejected the argument because KBC failed to elaborate—at all—upon the nature of the concerns that Fitzpatrick relayed to Gemunder. More importantly, the district court found that the Complaint failed to provide any specifics regarding the timing of this conversation between Fitzpatrick and Gemunder. *In re Omnicare, Inc.*, 2013 WL 1248243, at *9–*10.

We agree that there are not enough particulars in this eight-line paragraph to meet Rule 9(b)'s and the PSLRA's standards. Because KBC has failed to allege adequate facts demonstrating that the Individual Defendants had actual knowledge that the Form-10K statements were false when filed, we affirm the district court's dismissal of the suit against the Individual Defendants.

## 2. Corporate Scienter

Finally, we must determine whether the Complaint contains sufficient allegations to demonstrate that, collectively, Omnicare possessed actual knowledge that the Form 10-K statements were false and that Omnicare, nevertheless, made its Form 10-K statements (or failed

to correct them)**⁹** to defraud the public. In support of its argument, KBC points to Stone, Fitzpatrick, and Keefe, Omnicare's Chief Operating Officer, who ordered the Wave II Audit, and claims that they had actual knowledge of the audit results. Moreover, KBC claims that knowing this, Omnicare nevertheless filed the Form 10-claims to defraud the public. While we agree with KBC that the knowledge of Stone can be imputed to Omnicare, we conclude that this claim must be dismissed because KBC pleads too few facts to give rise to a strong inference of fraudulent intent. The countervailing inferences, at least on the facts alleged, are too strong.

First, under our formulation of collective corporate scienter, the knowledge of Stone can be imputed to Omnicare, though not the knowledge of Fitzpatrick and Keefe. Stone's knowledge can be considered because he was both an "individual agent who. . . [allegedly] furnished information for, . . . [and] reviewed . . . the statement in which the misrepresentation was made before its utterance or issuance" and potentially a "high managerial agent . . . who ratified . . . or tolerated the misrepresentation after its utterance or issuance . . . ." Abril & Olazábal, *Locus*, *supra*, at 135; *see also* R. 94 at 18, 19, 21, 24 (Compl. at ¶¶ 38, 42, 49, 55) (Page ID #842, 843, 845, 848) (noting that Stone was a Vice President at Omnicare and conducted the audits). In contrast, Fitzpatrick's knowledge cannot be imputed to Omnicare, because the Complaint states that Fitzpatrick served as Chief Compliance Officer only "through 2008," meaning that he could have left the company before Stone conducted the Pharmacy Audit. *Id.* at 31 ¶ 82 (Page ID #855). Furthermore, it is unclear when the Wave II Audit was completed, and the Complaint never alleges that Stone shared the results of the Wave II Audit with Fitzpatrick. *Id.* Likewise, Keefe's knowledge is out of bounds under our conception of collective scienter because there are no allegations that Keefe played any role in formulating the Form 10-K statements or that he knew of the results of the Wave II Audit and the Pharmacy Audit. *See id.* at 21 ¶ 49 (Page ID #845). Absent one of those allegations, Keefe's knowledge, like Fitzpatrick's, cannot be imputed to Omnicare.

Second, even though Stone's knowledge of the audit results can be imputed to the corporation, KBC fails to plead sufficient facts that would give rise to a strong inference that

---

**⁹**Because the analysis of scienter is relatively the same for the alleged misrepresentations and omissions, for the sake of clarity, we will refer only to the misstatements.

Omnicare acted to defraud the public. As noted above, in *Helwig*, this court identified nine, non-exhaustive factors that can help determine scienter. *See* 251 F.3d at 552. Among the relevant considerations were: "divergence between internal reports and external statements on the same subject"; "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"; "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit"; and "the self-interested motivation of defendants in the form of saving their salaries or jobs."[10] *Id.* In this case, the totality of these considerations cuts against finding a strong inference of scienter, and thus, we affirm the dismissal of the Complaint.

Regarding the first relevant factor, KBC has alleged enough facts to show that a reasonable jury could find a divergence between internal reports (the audits) and external statements (the Form 10-K statements). This factor favors KBC, but perhaps not as strongly as KBC believes that it does. There is a disparity between the levels of generality at which the internal reports and external statements are framed. While this disparity is more relevant to the jury's inquiry into whether the misstatements were objectively false, it also plays some role in the scienter analysis. Importantly, in cases where we have found scienter to be sufficiently pleaded, this disparity did not exist. *See City of Monroe*, 399 F.3d at 684.

The other relevant factors do not favor KBC. One, there was a large time lapse between Omnicare's legal-compliance statements and the disclosure of the Stone *qui tam* action, suggesting a lack of scienter. Again in *City of Monroe*, this court put considerable weight on the fact that only a week separated Firestone's misleading statement and the disclosure to the market because this short turnaround made it less likely that the corporation did not know that its statement was misleading. Two, unlike *City of Monroe*—cited repeatedly by KBC—Omnicare's Form 10-K statements were not made in the shadow of ongoing litigation. Furthermore, when Stone filed his *qui tam* action, Omnicare did not settle but vigorously defended itself. And three, KBC alleged no facts, other than the Individual Defendants' general interest in being paid, that lead to an inference that the Individual Defendants or Omnicare fraudulently misled the public to save their jobs or salaries. If a well-pleaded complaint can allege only that a corporation

---

[10]The other factors relate to conflicts of interest, which no party raises in this court.

intended to defraud based on a desire to continue earning money, without showing a particular link between the actual statement and a specific payment, then the heightened pleading standard for scienter has no bite. Accordingly, each of these factors cuts against finding an inference of scienter—let alone, a strong one—and thus, we affirm the district court on this basis.

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of KBC's complaint.