NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0363n.06

No. 21-3863

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | **FILED** Sep 01, 2022 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE NORTHERN DISTRICT OF OHIO |
| VIEWRAY, INC.; SCOTT DRAKE; AJAY BANSAL; JAMES F. DEMPSEY; CHRIS A. RAANES; SHAHRIAR MATIN, | ) ) ) ) |  |
| Defendants-Appellees. | ) ) |  |

Before: NORRIS, SUHRHEINRICH, and CLAY, Circuit Judges.

SUHRHEINRICH, Circuit Judge. Plymouth County Retirement Association appeals the dismissal of its complaint in this securities-fraud action against ViewRay, Inc., and some of its officers. Because Plymouth failed to meet its hefty pleading burden under the Private Securities Litigation Reform Act and Federal Rule of Civil Procedure 9(b), we affirm.

**I.**

*ViewRay's Business.* ViewRay designs, manufactures, and markets the Linac MRIdian, a machine that images and treats cancer simultaneously using MRI-guided radiation. The MRIdian can distinguish between types of soft tissue and thus deliver radiation more accurately, reducing collateral damage to healthy tissue. Nearly all of ViewRay's revenue comes from sales of the MRIdian.

Each MRIdian system costs about $6 million, a cost that's substantially more than radiation-therapy systems lacking the MRI feature, but about the same as those with it. That sticker price comes with other costs too. Typically, a customer needs between nine and fifteen months after ordering an MRIdian to construct and prepare the room in which it'll be installed—called a "vault" in industry jargon. R. 55 at 1264–65 ¶ 36. Installation of the machine in the vault usually takes another 60 to 90 days. All told, the time from contract-signing to installation is usually between 12 and 18 months. However, due to the complicated nature of this sale, ViewRay is often left to "mov[e] at [its] customers' pace"—which could extend the process even further. *Id.* at 1293 ¶ 115.

ViewRay went public in July 2015. Since then, the company has largely operated at a loss and has raised capital to fund its operations. ViewRay held two public offerings of stock during the alleged class period, raising about $173 million in August 2018 and about $150 million in December 2019.

*ViewRay's Marketing and Backlog.* ViewRay sells the MRIdian in the United States and abroad. In the United States, ViewRay sells through a direct sales force. Abroad, ViewRay primarily uses third-party distributors supported by ViewRay employees. To estimate future revenue from MRIdian orders, ViewRay uses a "backlog" to track "all orders for which ViewRay has not recognized revenue and that ViewRay considers 'valid.'" *Id.* at 1254 ¶ 3.

Plymouth's theories of fraud center on this backlog. Simply stated, Plymouth claims that ViewRay misled investors by failing to follow the publicly disclosed criteria for determining which orders to include in the backlog, which thereby inflated the backlog with orders that didn't belong; because ViewRay did not disclose to investors that it failed to follow the backlog criteria, those omissions were misleading given ViewRay's other disclosures about the backlog.

*Parties and Procedural History.* The original complaint was filed by a different plaintiff on behalf of a putative class of purchasers of ViewRay's common stock between March and August 2019. As a member of the proposed class, Plymouth moved for (and was granted) appointment as lead plaintiff; it then filed its first amended complaint on behalf of a differently defined class (those who purchased ViewRay stock between May 10, 2018, and January 13, 2020). In addition to suing ViewRay, Plymouth named several ViewRay officers (current and former) as individual defendants; their identities are irrelevant for our purposes.

ViewRay moved to dismiss the first amended complaint for failure to state a claim; after that motion was fully briefed, Plymouth moved for leave to amend the complaint again, which the district court granted in a text-only order, and the second amended complaint (the "operative complaint") was docketed.

ViewRay moved to dismiss the operative complaint for failure to state a claim, arguing that Plymouth failed to meet the heightened pleading standards for securities fraud under the Private Securities Litigation Reform Act ("PSLRA"), Federal Rule of Civil Procedure 9(b), or both. The district court agreed, granting the motion in a thorough and well-reasoned opinion and order. *See generally Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 791, 801–02 (N.D. Ohio 2021). Plymouth now appeals.

## II.

We review de novo an order granting a Rule 12(b)(6) motion to dismiss. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). We construe the complaint in the plaintiff's favor and accept its well-pleaded factual allegations as true. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 809 (6th Cir. 2022). Although our review is normally limited to the complaint, we may also consider any document attached to the defendant's motion

to dismiss if it "is referred to in the complaint and is central to the plaintiff's claim." *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (citation omitted); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466–67 (6th Cir. 2014).

To avoid dismissal, any complaint generally must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Securities-fraud complaints like Plymouth's, however, must clear a higher bar. The PSLRA stands as an "elephant-sized boulder" to such suits and its "requirements are not easily satisfied." *Omnicare*, 769 F.3d at 461. Along with Federal Rule of Civil Procedure 9(b), the PSLRA requires certain elements of these claims (including both elements considered here) to be pleaded with particularity. *Astec Indus.*, 29 F.4th at 810, 812. At bottom, the plaintiff must "allege the 'who, what, where, when, and why' of the fraudulent statements." *Id.* at 810 (citation omitted).

## III.

Count One of the operative complaint alleges that ViewRay violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful for anyone to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78j(b).[1]

Section 10(b) claims have six elements, but ViewRay challenges Plymouth's allegations as to only three of them—arguing Plymouth failed to adequately allege that (1) ViewRay made "a material misrepresentation or omission" (what we call the "falsity" element) in connection with the sale of a security, (2) ViewRay made that statement or omission with the requisite scienter,

---

[1] SEC Rule 10b-5 implements Section 10(b), and its "coverage" is "coextensive with" Section 10(b). *SEC v. Zanford*, 535 U.S. 813, 816 n.1 (2002).

and (3) the alleged fraud caused Plymouth's loss. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). Falsity and scienter must be pleaded with particularity, *Astec Indus.*, 29 F.4th at 810, 812, while loss causation need be pleaded only plausibly, *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016).

The district court reached only the falsity and scienter elements, finding that Plymouth failed to adequately allege either. *See Plymouth*, 556 F. Supp. 3d at 786–801. Although ViewRay renews its arguments as to all three elements, we focus on falsity, since (as explained below) Plymouth's appeal revolves almost entirely around that element. Because we conclude as such, we need not separately analyze scienter. *See Astec Indus.*, 29 F.4th at 812 (explaining that scienter must be alleged for each false or misleading statement). That said, the district court's scienter analysis was sound and provides an alternative basis for affirming the decision below.

### A.

Plymouth claims that ViewRay falsely inflated the backlog with orders that did not meet its publicly disclosed backlog criteria. The district court concluded that Plymouth failed to plead enough; it reasoned that "ViewRay . . . sufficiently identified discretion and judgment as factors" in determining which orders to include in the backlog. *Plymouth*, 556 F. Supp. 3d at 787; *see also id.* (observing that ViewRay "cautioned [investors] that determining when or how much of the backlog would turn into revenue presented a difficult exercise"). Based largely on this finding of subjectiveness, the court held that Plymouth insufficiently alleged (1) that any backlogged order identified by Plymouth violated the backlog criteria, *id.* at 787–88 (discussing "sham orders," stale orders, and allegedly invalid distributor orders), (2) that ViewRay's statements regarding the

backlog's value were false, *id.* at 788–90, or (3) that ViewRay misled investors regarding its revenue projections, *id.* at 790–91.[2]

We agree with each of those conclusions, and we confine our analysis to one narrow issue. On appeal, Plymouth rests each falsity theory on a single premise: That ViewRay's backlog criteria objectively require every backlogged order to have a contract signed by an end-customer, except where the end-customer was not required to pay a deposit. It argues that ViewRay violated this requirement for several orders in the backlog, then failed to disclose that fact, thereby misleading investors. And, because this "firm, objective requirement" is not subject to ViewRay's judgment and discretion, Plymouth argues that the backlog criteria's references to subjective factors are beside the point. *See* Pl. Opening Br., pp. 19, 22.

Although we agree with the district court that ViewRay's backlog methodology turns largely on its discretion and subjective judgment, the narrow question we consider is whether the criteria also objectively require contracts signed by end-customers (except where a deposit is not required), as Plymouth argues.[3] We answer that question in the negative, apply it to the orders identified in the operative complaint, and then otherwise reject Plymouth's falsity theories for the reasons stated by the district court.

---

[2] Plymouth does not challenge this third conclusion on appeal, so we do not address it. Nor does Plymouth challenge the legal standard used by the district court; it instead takes issue with only the court's conclusions.

[3] Plymouth raised a slightly different version of this argument below, arguing that a contract is *always* required (irrespective of the deposit requirement), so certain third-party distributor orders lacking end-customer contracts violated the backlog criteria. The district court rejected this claim, concluding that the criteria do not require contracts signed by end-customers to include distributor orders in the backlog. *Plymouth*, 556 F. Supp. 3d at 788. We agree with that conclusion too, as explained below. We also note that, although Plymouth's argument here is slightly different from the one made below, we need not resolve whether it was forfeited, since we conclude it fails on the merits. *See, e.g.*, *Rui He v. Rom*, 751 F. App'x 664, 670 (6th Cir. 2018).

*The Backlog Criteria's Objective Requirements.* We interpret the backlog criteria, and discern their requirements, as a reasonable investor would. *See Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988). In its first-quarter 2018 Form 10-Q, ViewRay provided those criteria:

> The determination of backlog includes objective and subjective judgment about the likelihood of an order contract becoming revenue. . . . Among other criteria we use to determine whether a transaction to be in backlog, *we must possess both an outstanding and effective written agreement for the delivery of a MRIdian signed by a customer with a minimum customer deposit or a letter of credit requiremen*t, *except when the sale is to a customer where a deposit is not deemed necessary or customary* (i.e. sale to a government entity, a large hospital, group of hospitals or cancer care group that has sufficient credit, sales via tender awards, or *indirect channel sales that have signed contracts with end-customers*).

R. 60-9 at 1594–95 (emphases added).

The parties share plenty of common ground as to what this disclosure requires. They agree that it identifies two objective criteria: (1) a "written agreement for the delivery of a[n] MRIdian" and (2) a "customer deposit or a letter of credit." *Id.* at 1595. They also agree that ViewRay "must possess both" of those to include an order in the backlog, "except when the sale is to a customer" who is not required to pay a deposit. *Id.* And they agree that a deposit is not required for "indirect channel [(*i.e.*, distributor)] sales that have signed contracts with end-customers," among other types of sales. *Id.*

Plymouth and ViewRay part ways, however, as to whether certain orders may be backlogged if they lack contracts signed by end-customers. And that question turns on whether the "except when" clause exempts both the written-contract *and* deposit requirements, or only the deposit requirement, a point on which the parties also differ. Plymouth argues the except-when clause applies to both; an order that doesn't require a deposit could be backlogged *even if* it *also* lacks a written contract—unless it is "an indirect channel sale[]" (*i.e.*, a distributor sale), in which case the distributor must always have a contract signed by an "end-customer[]." Pl. Opening Br.,

p. 19 (citation omitted). ViewRay takes the opposite position, arguing that the except-when clause exempts only the deposit requirement; a distributor order may be backlogged even if there is no end-customer contract, so long as (presumably) the order comes with a deposit.[4] Defs. Br., p. 25; *see also id.*, p. 29 ("[I]f a distributor placed an order and provided a down payment, that order would not violate ViewRay's backlog criteria.").

ViewRay has the better reading of the criteria. Under the last-antecedent rule, "a limiting clause or phrase" (here, the phrase "except when the sale is to a customer where a deposit is not deemed necessary or customary") "should ordinarily be read as modifying only the noun or phrase that it immediately follows" (here, the phrase "signed by a customer with a minimum customer deposit or letter of credit requirement"). *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Although this rule "is not an absolute and can assuredly be overcome by other indicia of meaning," no such indicia exist here. *Id.* In fact, two indicia (among others) cut against Plymouth's reading.

First, Plymouth's reading would allow for the backlogging of orders supported by only *oral* agreements for MRIdians, whenever they are ordered by customers not required to pay deposits (*e.g.*, government entities, large hospitals, cancer-care groups with sufficient credit). That would likely surprise any reasonable investor, whom we doubt expects such immense transactions—a single MRIdian machine costs millions of dollars—to be done on a handshake (or less), without even a deposit to show for it. And it would make even less sense given Plymouth's rationale for its reading: that orders *with* written contracts are more likely to result in revenue than

---

[4] ViewRay stops just short of conceding that deposits are required for these types of distributor orders (those lacking end-customer contracts). *See* Defs. Br., p. 27 ("When evaluating whether to maintain orders in backlog, ViewRay will consider—among other factors—whether there is a signed agreement with a 'customer' and a deposit (if required)."). But this is the logical consequence of its reading; if deposits are generally required, and the except-when clause exempts only the deposit requirement, then a deposit is required whenever a condition triggering the clause is missing—like with distributor orders lacking contracts with end-customers. We therefore assume as much. At any rate, this matters little because (as discussed below) Plymouth failed to allege that any distributor order lacking an end-customer contract *also* lacked a deposit.

orders *without* written contracts. Put differently, the rationale for Plymouth's reading is squarely at odds with the consequences that would follow from it.

Second, Plymouth's reading would turn some of ViewRay's other disclosures into meaningless surplusage. For example, ViewRay's 2018 Form 10-K annual report disclosed that, when "decid[ing] whether to remove or add back an order from or to our backlog," ViewRay "evaluate[s] the following criteria: changes in customer *or distributor plans* or financial conditions; the customer's *or distributor's continued intent and ability to fulfill the order contract*; . . . and other reasons for potential cancellation of order contracts." R. 60-20 at 1711 (emphases added). If orders from distributors lacking end-customers could not be backlogged, ViewRay would not need to disclose how changes in *distributors'* plans could impact backlog— ViewRay could simply say that the orders in backlog turn only on the end-customers' plans. Accepting Plymouth's reading, however, would nullify these specific references to distributors' plans.

Plymouth's counterarguments fall short. It primarily argues that the criteria's reference to distributor "sales that have signed contracts with end-customers" requires signed contracts with end-customers before distributor orders may be backlogged. R. 60-9 at 1595. But this provision cannot be fairly read to mandate that—it merely *contemplates the possibility* of distributors having contracts with end-customers for some orders. And, when that's the case, the provision states only that such orders are of the type (like orders from government entities or large hospitals) that do not require *deposits*. Critically, however, that in no way forecloses the counterfactual—a distributor order *lacking* a contract with an end-customer, which may be backlogged if paired with a *deposit*.

Plymouth responds that, even in such cases, the backlog criteria still require a "written agreement . . . with a customer"—the backlog's first objective criterion. *See* Pl. Reply Br., pp. 4,

5–6 (citation omitted). True, but Plymouth fails to persuade us why this reference to *customer* must be read to mean *end*-customer. ViewRay argues that "customer" refers to *either* end-customers *or* distributors, and we see no better reading than that. Most importantly, that the backlog criteria differentiate in the same breath between "customers" and "end-customers," *see* R. 60-9 at 1595, is strong support for this dual interpretation: If ViewRay meant that "written agreement . . . with a customer" requires contracts from *end*-customers, ViewRay would have said so—as it said just a few words later in the parenthetical describing which orders do not require deposits, *see id.*

Further, context—in particular, how ViewRay recognizes revenue for some distributor orders—reinforces this dual interpretation of customer. When ViewRay sells an MRIdian directly to an end-customer (not through a distributor), ViewRay itself typically installs the machine, then recognizes revenue after installation. For "[c]ertain customer contracts with distributors," however, "the distributors typically perform the installation." R. 60-20 at 1726. And, for those orders, ViewRay recognizes revenue "when the entire system is delivered," not installed. *Id.* Put differently, ViewRay hands off the machine to the distributor (who is then in charge of installation), at which point ViewRay considers the deal done and recognizes revenue. That makes the distributor practically identical to a customer. This is further underscored by Plymouth's own allegations, one of which asserts that a Chinese distributor accepted and warehoused several machines, intending to "on-sell" them to end-customers. R. 55 at 1275 ¶ 61. That distributor, though not an *end*-customer, is effectively a customer—especially if ViewRay recognized revenue for these orders upon delivery (and Plymouth alleges no facts suggesting otherwise).

In sum, the backlog criteria do not objectively require that every backlogged order (except those not requiring deposits) be supported by contracts with end-customers. Rather, to include an

order in the backlog, the criteria generally require ViewRay to possess (1) a written agreement signed by a customer (which could be either an end-customer or a distributor) and (2) a deposit, unless the sale is to a customer who is not required to pay a deposit; and customers not required to pay deposits include (among others) distributors with contracts signed by end-customers.[5] Therefore, when a distributor orders a machine based on a contract signed by an end-customer, the order may be backlogged without a deposit. On the flipside (when a distributor orders a machine but lacks a contract with an end-customer), the order may *still* be backlogged if it comes with a deposit and the distributor signs a contract with ViewRay.

*No Order Violated the Backlog's Objective Criteria.* Having nailed down the backlog's objective criteria, we turn to Plymouth's allegations that ViewRay included invalid orders in the backlog; according to Plymouth, those invalid orders inflated the value of the backlog, misleading investors. Plymouth's problem, however, is that it failed to allege—let alone with particularity—facts suggesting that any such order was "invalid" under the backlog criteria. *See Astec Indus.*, 29 F.4th at 810 ("[W]hen examining allegedly fraudulent statements, we ask: Who said the statement? What is the statement? Where did they say it? When did they say it? Why is it misleading? . . . If the complaint does not answer all of these questions, it fails to sufficiently plead securities fraud.").

Start with Plymouth's allegations regarding distributor orders. Although each order allegedly lacked contracts signed by end-customers, Plymouth failed to allege that any order also lacked a *deposit*—the other path to including a distributor order in the backlog. And no order was alleged to lack a contract between the distributors and ViewRay. This is fatal: Plymouth failed to plead any facts showing that these distributor orders violated the backlog's criteria.

---

[5] Again, we assume that these are truly objective and independent requirements—separate from ViewRay's subjective judgment—in the way that Plymouth claims. We can assume as such because, as discussed next, Plymouth has failed to plead sufficient facts showing that any order violated these objective requirements.

Plymouth's allegations regarding direct (not distributor) orders fare no better, but for different reasons. Plymouth claims that one university "was not moving forward with the installation of the MRIdian system, despite a signed contract in place." R. 55 at 1274 ¶ 58. Similarly, Plymouth alleges that a different "university hospital . . . was unclear as to when it would proceed with" the second of two orders, after the first order was installed. *Id.* at 1275 ¶ 60. The operative complaint fails to allege, however, that these orders could not be cancelled per the terms of their contracts, which was a risk that ViewRay forthrightly disclosed. R. 60-9 at 1594 ("Orders may be revised or cancelled according to their terms or upon mutual agreement between the parties."). Moreover, Plymouth stops short of alleging that these orders would *never* move forward—as opposed to being temporarily stalled in the morass of a complicated sales process— and, even if we inferred otherwise, Plymouth does not allege that the orders *remained* in the backlog after ViewRay knew they would not move forward.

The last allegation claims that a different university did not pay a deposit or paid "a deposit that was so small that it was not an impediment to the customer walking away from the order." R. 55 at 1274–75 ¶ 59. But Plymouth does not allege any facts suggesting that this university was required to pay a deposit in the first place. And that seems doubtful, at any rate, because "government entit[ies]" and "large hospital[s]" need not pay deposits under the backlog criteria, R. 60-9 at 1595—two boxes in which a university hospital (especially a public university hospital) could comfortably fit.

In short, for those reasons and the additional reasons provided by the district court, Plymouth failed to plead with particularity any theory of falsity based on the backlog.

**B.**

Plymouth's scienter allegations rise and fall with its falsity theories—since the PSLRA requires plaintiffs to, "'with respect to *each act or omission alleged*[,] . . . state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind' in violating the securities laws." *Astec Indus.*, 29 F.4th at 812 (first emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Plymouth failed to allege any material misrepresentation or omission, so we need not analyze scienter. Nonetheless, the district court conducted a scienter analysis, after apparently assuming for argument's sake that Plymouth adequately alleged falsity. *Plymouth*, 556 F. Supp. 3d at 791–801. Because we find no error in the district court's scienter analysis, we affirm alternatively on that basis. We do so for the reasons stated in the district court's thorough opinion.

**IV.**

Finally, Count Two of the operative complaint alleged control-person claims, under Section 20(a) of the Securities Exchange Act, against ViewRay's officers and directors. *See generally* 15 U.S.C. § 78t(a). Control-person claims are viable only if the plaintiff first adequately pleads a "primary violation of the securities laws" (here, Section 10(b) and SEC Rule 10b-5). *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1045 (6th Cir. 2016). Because Plymouth failed to do so, we likewise affirm the dismissal of these claims.

**V.**

We affirm the judgment of the district court.